

FILED

Aug 02 2019, 5:34 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

APPELLANT PRO SE

Jim Brugh
Logansport, Indiana

ATTORNEYS FOR APPELLEES

Jeffrey D. Stanton
Logansport, Indiana

Yamir Gonzalez Velez
Logansport, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jim Brugh,

*Appellant-Plaintiff,*

v.

James L. Sailors, Cass County
Commission, et al.,

*Appellees-Defendants*

August 2, 2019

Court of Appeals Case No.
18A-PL-2730

Appeal from the Cass Superior
Court

The Honorable James K.
Muehlhausen, Judge

Trial Court Cause No.
09D01-1410-PL-36

**Altice, Judge.**

## Case Summary

[1]     In 1922, Cass County dedicated a World War I memorial (Memorial Home) in Logansport. The Board of Trustees for Memorial Home stopped functioning around 2001 and the County took over maintenance, but Memorial Home fell

into disrepair. In 2014, the Cass County Commissioners deeded Memorial Home to the City of Logansport without reference to the property's dedicated purpose. Jim Brugh, a concerned citizen, filed a complaint for declaratory judgment against the County and the City, challenging the transfer. Brugh's suit resulted in entry of an agreed judgment between the parties in February 2016 (the Agreed Judgment).

[2] Brugh filed a petition for enforcement of the Agreed Judgment in May 2018, arguing that the City and County had yet to comply. Additionally, Brugh alleged that the County Council should be found in contempt due to its refusal to commit $62,500 toward improvements for Memorial Home as part of a second grant application.

[3] Following a hearing, the trial court denied Brugh's petition for enforcement and found that the County Council was not in contempt. On appeal, Brugh argues that the trial court failed to enforce the Agreed Judgment as written and abused its discretion by not finding the County Council in contempt.

[4] We affirm in part, reverse in part, and remand.

## Facts & Procedural History

[5] Over 1000 Cass County citizens served as soldiers or sailors in World War I. After the war, in 1919, the Indiana Legislature passed an act in Chapter 115 of the Acts of 1919 (the Act) authorizing the several counties and cities within the state to finance, build, manage, and maintain memorials related to the war.

Cass County citizens petitioned the County for such a memorial, and the Cass County Commissioners granted the petition in June 1920 and determined that $35,000 should be expended for this public purpose. In July, the newly-appointed Board of Trustees for the memorial successfully petitioned the County to purchase the Baldwin homestead at 7th and Market Streets in Logansport for the memorial site. The County issued bonds, as allowed by the Act, to cover the purchase price. On May 14, 1922, the County officially dedicated Memorial Home as a war memorial. Memorial Home was maintained by the Board of Trustees and the County and utilized by the public for the next several decades.

[6] By the early 2000s, the building on Memorial Home's grounds had fallen into disrepair and the Board of Trustees ceased to exist. The County took over maintenance of the building, and weddings and public events continued to be held on the grounds. In 2010, after receiving a federal Community Development Block Grant (CDBG) for a feasibility study, the County hired an architect and design firm to study the feasibility of expanding the use of Memorial Home as a community center. The resulting 2010 Master Plan made recommendations, provided options, and estimated the total project cost at about $1.5 million, which would escalate at 4% per year.

[7] On June 16, 2014, the County Commissioners transferred Memorial Home, by quit claim deed, to the City of Logansport. The deed did not make reference to the property's dedicated purpose. In October of that year, Brugh filed a complaint for declaratory judgment against the County and injunctive relief

against the City. Brugh argued that the transfer was invalid and that the Board of Trustees should be reappointed to control Memorial Home. Further, Brugh asked the trial court to direct the County Commissioners to expend funds to maintain and repair Memorial Home "as required by the trustees, pursuant to the law." *Appellant's Appendix Vol. 2* at 20. Finally, pending outcome of the case, Brugh requested that the City be enjoined from transferring title to Memorial Home or altering the structure in any way.

[8] During a summary judgment hearing in November 2015, the parties asked to recess the matter to see if it could be resolved by agreement. Thereafter, on February 29, 2016, the parties' Agreed Judgment, which was drafted by Brugh, was accepted by the trial court. The Agreed Judgment began by setting out certain details of the Act and the history of the establishment of Memorial Home. Within the Agreed Judgment, the County and City expressly agreed that "Memorial Home is dedicated as a war memorial and shall be preserved for that purpose, pursuant to their contract." *Id*. at 67. To this end, the Agreed Judgment required the following of the County and City:

> 6. The City will execute a new deed which transfers Memorial Home to itself and to the Cass County Commissioners, jointly; that deed will refer to the dedication and preservation of Memorial Home as a war memorial, pursuant to I.C. 10-18-4-2(b)(3) and I.C. 10-18-4-12.

> 7. The City of Logansport and the Cass County Commissioners shall enter into a contract related to the establishment of the joint World War memorial, pursuant to I.C. 10-18-4-11(e), including, but not limited to, subsection (5) which mandates the provision:

"(5) that the necessary cost and expenses for the management, maintenance, repairs, and improvement of the World War memorial shall be paid by the county and city in the same proportion that they contribute to the establishment of the memorial."

*Id*. at 67-68.

[9]     Although the City did not execute a deed as required by the Agreed Judgment, the City and County proceeded as joint owners of Memorial Home thereafter. In 2016, a Board of Trustees (the Board) was appointed, with Mike Fincher serving as president from November 2016 through January 2018. Fincher worked closely with Deputy Mayor Mercedes Brugh regarding the maintenance and repair of Memorial Home. He walked through the building with the architect and reviewed the 2010 Master Plan and a privately-funded, updated version of the plan (the 2017 Plan Update). The 2017 Plan Update, at the request of Deputy Mayor Brugh, broke the project up into three phases – a stabilization phase, a rehabilitations phase, and an upgrades phase. The total cost of the project for all phases was estimated to be between $1.7 million and $2 million. There was also an environmental site assessment conducted for the County in 2016, which estimated environmental remediation of Memorial Home to cost around $70,000.

[10]    After conferring with the Board and county and city officials, the City took the lead in preparing a CDBG grant application in 2017 in the amount of $633,050, which would be used to fix the roof, stabilize the foundation, and complete "some ADA work". *Transcript Vol. II* at 76. The actual grant would be

$500,000, and the City and County would equally split the match amount of $125,000 and the rest would be raised through private donations and the Community Foundation. By March 2017, both the City and County had committed to pay their respective match amounts of $62,500 in a joint attempt to secure the CDBG grant.

[11] While the CDBG grant application was pending, the City and County entered into a joint operating agreement in July 2017 (the Operating Agreement). The Operating Agreement referenced the prior litigation and the decree that the City and the County "work together for the mutual benefit of operating the building known as [Memorial Home], as a war memorial, a tribute to the men and women from Cass County who served their country." *Appellant's Appendix Vol. 2* at 110. The Operating Agreement, which was rather detailed with eighteen separate articles, addressed the appointment of members to the Board, as well as the specific powers, duties, and goals of the Board. We find the following two articles of the Operating Agreement to be of particular note:

**ARTICLE 5**

The President of the Cass County Commissioners and the Logansport Mayor may hire a salaried Executive Director/Manager (ED/M) upon mutual agreement by both the County and City Councils who will be directed by the Commissioner President and Mayor to manage [Memorial Home]. The County and City Councils shall establish the ED/M's compensation and benefits package. The Board and the ED/M shall set policy for the use of the facility. The Board will work in unison with the ED/M. It will be the goal of the Board

and ED/M to secure grant funding, public and private donations, and user fees. It will be the goal of the Board and the ED/M to operate [Memorial Home] as financially independent of the city and county annual budgets with four exceptions:

1. Cass County and Logansport will be equally responsible for the initial shared costs of property insurance.

2. If approved, Cass County and Logansport will be equally responsible for the ED/M's salary and benefits.

3. Any one-time expenses associated with matching grants, or capital improvements that are not considered ongoing continuous expenses, will be borne equally by the County and City if the applications are agreed upon by Logansport and Cass County.

4. All utility costs not paid directly as a payment in lieu of taxes by the Logansport Municipal Utilities will be shared equally by the County and City.

****

**ARTICLE 10**

It is the duty of the Board and its ED/M to endeavor to execute the terms of an agreed upon long-term master plan for [Memorial Home], to secure funding from private and public sources and grants for that work, and to update the public and public officials regularly on the progress of completing work on the master plan when this agreement takes effect. It is the intention of the joint agreement to require an ongoing maintenance and capital

improvement plan for [Memorial Home] after the completion of the master plan.

*Id.* at 111-12. Article 18 of the Operating Agreement provided that the County and City would obtain a joint deed on Memorial Home's building and property.

[12] In late 2017, the CDBG application was rejected. Thereafter, several city and county officials, Fincher, and others attended a meeting to obtain feedback from grant program officials. On November 17, 2017, the County Council voted not to commit money to a second CDBG grant attempt. Council members expressed concern that the Board did not have a plan regarding use of the building and that even if the County committed the $62,500 for the match, the Board still wanted another $750,000 to complete the project.[1]

[13] On May 18, 2018, under the 2014 cause number, Brugh filed a petition to enforce the Agreed Judgment and for determination as to whether the Operating Agreement conforms to law. Brugh alleged that a joint deed had not been written and that the Operating Agreement failed to include a description of the costs to repair the Memorial Home and apportion those costs between the City and County. Additionally, Brugh alleged in his petition that the County Council had engaged in contemptuous conduct by its "refusal to fund the memorial as part of the CDBG application". *Id.* at 79.

---

[1] On August 7, 2017, on request of the Board, the Common Council of the City passed a resolution to commit up to $1,000,000 toward repair of Memorial Home on the condition that the County Council commit to match the funds dollar for dollar. The County has made no such commitment.

[14] The trial court held an evidentiary hearing on August 28, 2018. Fincher, Deputy Mayor Brugh, County Commissioner Jim Sailors, County Council President George Stebbins, and the County's superintendent of buildings Richard Gundrum testified at the hearing. In addition to the facts as set out above, evidence was submitted that since the beginning of 2017, the County had been contributing to maintenance of Memorial Home, including utilities, roof repairs, and other expenses that were shared with the City. The County had also provided a furnace for Memorial Home to prevent mold from reoccurring following remediation by a volunteer. In all, the County had contributed up to $40,000. The building, however, remained closed to the public. Commissioner Sailors testified that the County plans to maintain and improve Memorial Home "as we can afford to do it" and "as our constituents want us to do." *Transcript Vol. II* at 93. Commissioner Sailors noted further that the County was currently needing to expand the jail, which was estimated to cost over $17 million.

[15] On November 6, 2018, the trial court issued its order in favor of the City and County. The trial court found that there had been a "good faith effort" by both entities to comply with the Agreed Judgment and the Operating Agreement. *Appellant's Appendix Vol. 2* at 11. The court also found that the County Council "acted within it's [sic] authority as the fiscal branch of county government" and, thus, was not in contempt. *Id*. Brugh now appeals. Additional information will be provided below as needed.

## Discussion & Decision

[16]     As a consent judgment, the Agreed Judgment is both contractual, in that it is an agreement between the parties settling the underlying dispute, and an entry of judgment by the court. *See Stenger v. LLC Corp.*, 819 N.E.2d 480, 482 (Ind. Ct. App. 2004), *trans. denied*. A trial court that adopts a consent judgment retains jurisdiction to interpret the terms of the agreement and to enforce them. *See Whittaker v. Whittaker*, 44 N.E.3d 716, 719 (Ind. Ct. App. 2015).

[17]     When reviewing the construction of the terms of a written contract, which is a pure question of law, our standard of review is de novo. *Id.*

> The interpretation and construction of a contract is a function for the courts. In construing a consent judgment, the court must determine and effectuate the intent of the parties. If the language of the agreement is unambiguous and the intent of the parties is discernible from the written contract, the court must give effect to the terms of the contract. A contract is ambiguous if a reasonable person would find the contract subject to more than one interpretation. The terms of a contract are not ambiguous merely because the parties disagree as to their interpretation. Where the terms of a contract are clear and unambiguous, the terms are conclusive and we will not construe the contract or look at extrinsic evidence, but will merely apply the contractual provisions.

*Stenger*, 819 N.E.2d at 484 (citations omitted). "The meaning of a contract is to be determined from an examination of all of its provisions, not from a consideration of individual words, phrases, or even paragraphs read alone." *Evan v. Poe & Assocs., Inc.*, 873 N.E.2d 92, 98 (Ind. Ct. App. 2007).

[18] The Agreed Judgment required the City and County to do two things with respect to Memorial Home. First, pursuant to Paragraph 6 of the Agreed Judgment, the City was obligated to execute a deed of dedication transferring Memorial Home jointly to itself and the County and expressly referring to the dedication and preservation of Memorial Home as a war memorial pursuant to I.C. §§ 10-18-4-2(b)(3)[2] and 10-18-4-12.[3] The City and County acknowledged at the evidentiary hearing that no such deed had issued.[4] Accordingly, we reverse the trial court's determination that the City had complied with Paragraph 6. On remand, if the City does not provide the trial court with evidence that a joint dedication deed has been executed,[5] the trial court shall direct performance of this contractual requirement.

[19] The second requirement in the Agreed Judgment is set out in Paragraph 7, which specifies that the City and County

> shall enter into a contract related to the establishment of the joint World War memorial, pursuant to I.C. 10-18-4-11(e), including,

---

[2] This provision provides a city with the power to "[j]oin with the county in which the city is located to: (A) acquire by purchase, donation, or condemnation of interests in real property; (B) construct and maintain on the real property a joint city and county World War memorial; and (C) use the real property for other public purposes …."

[3] This statute addresses the establishment of a board of trustees for a joint city and county world war memorial.

[4] A judgment quieting title to the property in the name of the City and County was entered in May 2017. This, however, did not satisfy the Agreed Judgment's deed requirement because the quiet title decree did not contain any reference to the dedication and preservation of Memorial Home.

[5] The County asserts in footnote 1 of its brief that the City executed such a deed on December 12, 2018, which was after the hearing and after the trial court issued its order. The record before us, however, is devoid of any evidence in this regard, and the City does not make a similar assertion on appeal.

but not limited to, subsection (5) which mandates the provision: "(5) that the necessary cost and expenses for the management, maintenance, repairs, and improvement of the World War memorial shall be paid by the county and city in the same proportion that they contribute to the establishment of the memorial."

*Appellant's Appendix Vol. 2* at 68.

[20] Brugh asserts, and we agree, that Paragraph 7 of the Agreed Judgment required the City and County to enter into a contract for the preservation and maintenance of Memorial Home. They did just that in the Operating Agreement. This agreement established the Board and detailed the powers, duties, and goals of the Board. Article 3 required Board members to "act in the best interest of the community to maintain the building as a War Memorial and a National Register of Historic Places structure accessible to the general public." *Id.* at 110. Article 4 made it a "duty of the Board to operate [Memorial Home] as a 501(c) 3, nonprofit organization" and submit monthly reports to City and County officials on the financial progress and physical condition of the building. *Id*. The Operating Agreement made clear that a goal for Memorial Home was for it to be usable by the public and ADA compliant. In this vein, Article 10 required the Board (and the ED/M, if hired pursuant to Article 5)

> to endeavor to execute the terms of an agreed upon long-term master plan for [Memorial Home], to secure funding from private and public sources and grants for that work, and to update the public and public officials regularly on the progress of completing

work on the master plan when this agreement takes effect. It is the intention of the joint agreement to require an ongoing maintenance and capital improvement plan for [Memorial Home] after the completion of the master plan.

*Id*. at 112.

[21] Finally of note, Article 5 addressed the potential hiring of a salaried ED/M of Memorial Home, who would work with the Board to "set policy for the use of the facility" and to "secure funding, public and private donations, and user fees." *Id*. at 111. The express goal was to operate Memorial Home as financially independent of the City and County's annual budgets with the following four exceptions: (1) the City and County will equally share the initial costs of property insurance; (2) if approved, they will be equally responsible for the ED/M's salary and benefits; (3) one-time expenses associated with matching grants, or capital improvements that are not considered ongoing continuous expenses, will be borne equally by the County and City if the applications are agreed on by the County and City; and (4) utility costs will be shared equally.

[22] Brugh complains that the Operating Agreement did not go far enough. He claims that the Operating Agreement was required to include "a physical plan" for Memorial Home "including the reference to the cost to implement that plan and the apportionment of the cost of that project." *Appellant's Brief* at 19. The

Agreed Judgment, however, did not require such specificity nor does the referenced statute.[6]

[23]     I.C. § 10-18-14-11(e) provides:

> If the county and city determine to establish a joint World War memorial, then the board of public works, acting for the city with the approval of the mayor, shall execute a contract on behalf of the city with the county. The contract must provide as follows:
>
> > (1) For the acquisition of real property interests and the construction on the real property of a joint World War memorial suitable for the county and city.
> >
> > (2) For the definite and respective parts of the total cost of the World War memorial that will be paid by the county and by the city and the time and manner of the payments.
> >
> > (3) That the acquisition of the real property and the execution of all necessary contracts for the construction of the joint World War memorial shall be made by a board of trustees, consisting of five (5) members, to be appointed and have the powers and perform the duties as provided in this chapter.
> >
> > (4) That the total cost of the acquisition of the real property for the joint World War memorial and the

---

[6] Without explanation, Brugh consistently directs us to I.C. § 10-18-2-10(e), which is similar in many respects to I.C. § 10-18-4-11(e) but is not the statute expressly referenced in the Agreed Judgment, which Brugh drafted.

construction of the memorial may not exceed the sum of the following:

> (A) The amount appropriated for the memorial by the city and by the board of commissioners of the county.

> (B) Any amounts donated, contributed, or received by the city and by the county for the purpose of the World War memorial.

(5) *That the necessary cost and expenses for the management, maintenance, repairs, and improvement of the World War memorial shall be paid by the county and city in the same proportion that they contribute to the establishment of the memorial.*

(6) Any other provisions that may be agreed upon between the county and the city consistent with this chapter.

*Id*. (emphasis supplied).

[24] The difficulty with applying the whole of I.C. § 10-18-4-11(e) in this case is that Memorial Home has already been established, as it was dedicated in 1922 by the County. Thus, the bulk of the statutory provisions, which deal with the acquisition of real property, construction of the memorial on said property, and the costs of acquisition of the real property and of construction, do not really apply here. This is likely why the Agreed Judgment only expressly referenced subsection (5), which addresses the costs and expenses for the management, maintenance, repairs, and improvement of the memorial. With respect to this

subsection, the Operating Agreement indicated that the City and County would share equally the costs of property insurance and utilities, the ED/M's salary and benefits, and any one-time expenses associated with matching grants or capital improvements agreed upon by both parties. As noted above, the City and County also indicated in the Operating Agreement an intent to obtain funding and execute, through the Board and, if hired, the ED/M, the terms of an agreed-upon long-term master plan and to require ongoing maintenance and capital improvement of Memorial Home.

[25] We reject Brugh's request for us to read into the Agreed Judgment and I.C. § 10-18-4-11(e) a requirement that the Operating Agreement include a detailed plan for maintenance, repair, and improvement of Memorial Home. The 2017 Updated Plan, which was privately funded, indicates that improvements to Memorial Home could cost upwards of $2 million. While they continue to fund maintenance of Memorial Home, it is within the City and County's discretion, with input from the Board and the ED/M, to determine how, when, and in what amount costly improvements will be made. We have no authority, nor does Brugh, to require the City and County to each allocate $1 million toward rehabilitation of Memorial Home, which is essentially what Brugh desires.[7]

---

[7] Brugh notes that Fincher, as president of the Board, requested $1 million each from the City and County. While the City's Common Council resolved to spend that amount over the next two years, Brugh asserts, "The County did not cooperate." *Appellant's Reply Brief to Defendant City* at 8. While true, this fiscal decision was wholly within the County's prerogative.

[26]    Finally, we address Brugh's claim that the trial court abused its discretion by failing to find the County Council in contempt. "It is soundly within the discretion of the trial court to determine whether a party is in contempt[.]" *G.G.B.W. v. S.W.*, 80 N.E.3d 264, 268 (Ind. Ct. App. 2017), *trans. denied*. Additionally, because the trial court denied Brugh's petition, Brugh appeals from a negative judgment. *See id.* at 269. "In such circumstances, we will reverse the judgment only if it is contrary to law – where the evidence leads to but one conclusion and the trial court reached the opposite conclusion." *Id.*

[27]    To be held in contempt for failing to follow a court order, a party must have willfully disobeyed the court order. *City of Gary v. Major*, 822 N.E.2d 165, 170 (Ind. 2005). Further, the order "must have been so clear and certain that there could be no question as to what the party must do, or not do, and so there could be no question regarding whether the order is violated." *Id.*

[28]    Brugh has wholly failed to establish contempt. The record reflects that the County Commissioners committed a $62,500 match toward the first CDBG grant application. When this application failed, it was communicated by Fincher to the County Council that the Board sought a commitment not just for the $62,500 match for a second application "but they want[ed] to know that [the Council was] willing to put another seven hundred and fifty thousand into it [] to finish the job" after obtaining the grant. *Exhibits Vol. III* at 71. The County Council discussed the matter, including that the County had other major expenses on the horizon – expansion of the county jail – and that the Board did not have a sufficient plan for Memorial Home. As a result, the

County Council determined that it was not prepared, at the time, to commit over $800,000 in funds toward renovation of Memorial Home. We agree with the trial court that the County Council acted within its authority as the fiscal branch of county government and did not in any way willfully disobey the Agreed Judgment.

[29] We affirm in part, reverse in part, and remand for further proceedings regarding the enforcement of the deed provision of the Agreed Judgment.

Kirsch, J. and Vaidik C.J., concur.